UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
TERRE HAUTE DIVISION

| | |
|---|---|
| SALAH SALEM SARSOUR, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| v. ) | No. 2:26-cv-00224-JPH-MKK |
| ) | |
| BRISON SWEARINGEN Sheriff of Clay ) | |
| County, Indiana, ) | |
| TODD LYONS Acting Director, U.S. ) | |
| Immigration and Customs Enforcement, ) | |
| MARKWAYNE MULLIN Secretary of the ) | |
| United States Department of Homeland ) | |
| Security, ) | |
| MARCO RUBIO Secretary of State, ) | |
| TODD BLANCHE Acting Attorney ) | |
| General, ) | |
| ) | |
| Respondents. ) | |

**ORDER GRANTING MOTION FOR RELEASE
PENDING ADJUDICATION OF HABEAS PETITION**

Petitioner Salah Salem Sarsour is a lawful permanent resident who has lived in the United States for 33 years. On March 30, 2026, Immigration and Customs Enforcement (ICE) officers arrested Mr. Sarsour and initiated proceedings to have him removed, or deported, from the United States. Department of Homeland Security officials ordered that Mr. Sarsour be held in detention pending adjudication of his immigration case. Mr. Sarsour is being held at the Clay County Jail in Indiana. He has filed a petition for a writ of habeas corpus, dkt. 21, and a motion for release pending adjudication of his habeas petition, dkt. 32.

1

The sole issue addressed by the Court in this Order is Mr. Sarsour's motion for release pending adjudication of his habeas petition.  For the reasons explained below, the Court finds that it has jurisdiction over Mr. Sarsour's habeas petition, and by extension, his motion for release, and that Mr. Sarsour has presented a substantial claim of First Amendment retaliation.  The Court does not decide the ultimate outcome of Mr. Sarsour's First Amendment habeas claim or the merits of the charges of removability against him.  The Court only concludes, on the present record, that Mr. Sarsour has raised a "substantial" First Amendment retaliation claim, which could render his detention unlawful.  So, for the reasons set forth below, the Court **grants** Mr. Sarsour's motion for release, dkt. [32].  Respondents shall immediately release Mr. Sarsour on his personal recognizance, subject to the conditions set out below.

## I.    **Factual Background**[1]

### A. Mr. Sarsour's Immigration History

Born in Ramallah in the West Bank, dkt. 21 ¶ 21, Mr. Sarsour identifies himself as a stateless Palestinian, while Respondents consider him to be a Jordanian citizen, dkt. 29-2 at 11.

---

[1] Mr. Sarsour has sworn, under penalty of perjury, that the statements in his amended habeas petition are accurate. Dkt. 32-2 ¶ 4. Respondents do not contest many of those statements, so the facts referenced in this Order are accepted as true unless otherwise noted. Also, at the status conference held on June 8, 2026, the Court asked the parties if a hearing on the motion for release was needed or requested. All parties stated on the record that no hearing was necessary and no party requested a hearing, so the Court is ruling on the written record without a hearing.

Mr. Sarsour has resided in the United States for 33 years. *Id.* ¶¶ 21, 27. After entering the United States on an immigrant visa, he became a conditional lawful resident of the United States in 1993. Dkt. 21 ¶ 21. In 1998, he became a full lawful permanent resident. *Id.* In 2002, the Immigration and Naturalization Service approved Mr. Sarsour's naturalization application.[2] Dkt. 29-2 at 13.

**B. Mr. Sarsour's Criminal Convictions in Israel from 1989 and 1995**

Mr. Sarsour has no criminal record from the 33 years that he has lived in the United States. Dkt. 21 ¶ 104. He was, however, convicted of crimes committed outside the U.S. in 1989 and 1995 by the Israeli Ramallah Military Court. Dkt. 29-2 at 4, 7. In 1989, Mr. Sarsour was convicted of throwing a Molotov cocktail and stones at Israeli army forces. *Id.* at 4. In 1995, the Ramallah Military Court convicted Mr. Sarsour of attempting to hold weapons and ammunition. *Id.* at 7. Mr. Sarsour denies having committed those crimes. Dkt. 21 ¶ 34; *see also* dkt. 32-2 ¶¶ 4; 10–26, 31–54. For the purpose of deciding the motion for release, the Court accepts the convictions as facially valid.

---

[2] Why Mr. Sarsour was not naturalized is disputed. Department of Homeland Security documents state that Mr. Sarsour never appeared at scheduled oath ceremonies, and that his naturalization application was withdrawn. Dkt. 29-2 at 13–14. Mr. Sarsour states that he did not receive notice of the citizenship oath ceremony until after it had occurred. Dkt. 32-2 ¶ 73. Which version is correct doesn't matter for the purpose of adjudicating Mr. Sarsour's motion for release.

The United States government has been aware of these charges against Mr. Sarsour for 25 years, having considered them in 2000, 2008, 2010, and 2019 in evaluating Mr. Sarsour's eligibility for naturalization. Dkt. 21 ¶ 36.

### C. Mr. Sarsour's Palestinian Advocacy and Public Role in the U.S. Palestinian Community

For the last five years, Mr. Sarsour has served as the elected president of the Islamic Society of Milwaukee, the largest mosque in Wisconsin, and he is a board member of American Muslims for Palestine (AMP), a non-profit "engaged in education and advocacy on behalf of Palestinian rights." *Id.* ¶¶ 24–25. AMP states that its "sole purpose is to educate the American public and media about issues related to Palestine and its rich cultural and historical heritage." *Id.* ¶ 38 (quoting *Statement of Principles*, Am. Muslims for Palestine, https://www.ampalestine.org/about-amp/statement-principles (last accessed June 3, 2026)).

Mr. Sarsour speaks openly about his support for Palestinian human rights. *Id.* ¶ 37. Mr. Sarsour attests that because of his open support for Palestinian human rights, he was added to the Canary Mission website, which Mr. Sarsour describes as "an anonymously-run doxxing website based in Israel that relies on guilt-by-association, misrepresentations, and anti-Muslim and anti-Palestinian animus to smear and target individuals who advocate for Palestinian rights." *Id.* ¶ 39.

### D. Targeted Activity Against the U.S. Palestinian Movement

On October 7, 2024, the Heritage Foundation published "Project Esther: A National Strategy to Combat Antisemitism," which *The New York Times* reported "outline[s] an ambitious plan to fight antisemitism by branding a broad range of critics of Israel as 'effectively a terrorist support network,' so that they could be deported, defunded, sued, fired, expelled, ostracized and otherwise excluded from what it considered 'open society.'" *Project Esther: A National Strategy to Combat Antisemitism*, Heritage Found. (Oct. 7, 2024), https://www.heritage.org/progressivism/report/project-esther-national-strategy-combat-antisemitism (last accessed June 3, 2026); Katie J.M. Baker, *Inside the Heritage Foundation's Plan to Crush the U.S. Palestinian Movement*, N.Y. Times (May 18, 2025), https://www.nytimes.com/2025/05/18/us/project-esther-heritage-foundation-palestine.html; *see also* dkt. 21 ¶ 41. Project Esther names AMP as a group that is "part of a highly organized global Hamas Support Network (HSN) and therefore effectively a terrorist support network." *Project Esther*, https://www.heritage.org/progressivism/report/project-esther-national-strategy-combat-antisemitism.

Mr. Sarsour represents that, in February and/or March 2025, senior officials from the Trump Administration met numerous times to discuss implementation of the Project Esther policy to target, arrest, and deport individuals who publicly supported Palestinian rights. Dkt. 21 ¶ 48 (citing *Am. Ass'n of Univ. Professors v. Rubio*, 802 F. Supp. 3d 120, 138 (D. Mass. 2025) ("*AAUP*"), *judgment entered*, No. CV 25-10685-WGY, 2026 WL 524753 (D. Mass.

5

Jan. 22, 2026)). *The New York Times* reported that, by May 2025, the Trump administration called for or acted on more than half of Project Esther's proposals. Dkt. 21 ¶ 43 (citing Katie J.M. Baker, *Inside the Heritage Foundation's Plan to Crush the U.S. Palestinian Movement*, N.Y. Times (May 18, 2025), https://www.nytimes.com/2025/05/18/us/project-esther-heritage-foundation-palestine.html, *archived at* https://archive.is/bRBw5).

In January 2025, President Trump issued Executive Order (EO) 14161 which states, in part, "the United States must ensure that admitted aliens and aliens otherwise already present in the United States do not bear hostile attitudes toward its citizens, culture, government, institutions, or founding principles, and do not advocate for, aid, or support designated foreign terrorists and other threats to our national security." Dkt. 21 ¶ 45; Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025). "Hostile attitudes" is not defined. *Id.*

Beginning in March 2025, government agents arrested or attempted to arrest noncitizens who had spoken publicly in support of Palestinian rights or critically of the Israeli government. Dkt. 21 ¶¶ 49–54. To support the actions taken against some of the arrested noncitizens, the government invoked 8 U.S.C. § 1227(a)(4)(C)(i), a federal statute that provides: "[a]n alien whose presence or activities in the United States the Secretary of State has reasonable ground to believe would have potentially serious adverse foreign policy consequences for the United States is deportable." Dkt. 21 ¶ 55. Of the student protesters that Homeland Security Investigations investigated for immigration-related arrest and detention, more than 75% of the names came from Canary

Mission. *Id.* ¶ 62 (citing *AAUP*, No. 1:25-cv-10685, dkt. 186-1 at 751 (D. Mass, July 7, 2025) (deposition of Peter Hatch)).

### E.  Arrest and Detention of Mr. Sarsour

On June 18, 2025, Secretary of State Marco Rubio issued a memorandum to the Secretary of Homeland Security stating that he had determined that Mr. Sarsour was deportable under § 1227(a)(4)(C)(i). Dkt. 21-2 at 2. Secretary Rubio stated:

> I have determined the activities and presence of this alien in the United States would have potentially serious adverse foreign policy consequences and would compromise a compelling U.S. foreign policy interest because his actions undermine U.S. foreign policy to combat antisemitism around the world as well [as] U.S. foreign policy to combat activity that supports foreign terrorist organizations. These determinations are based on evidence provided by DS/ICE/HSI in its May 15, 2025, letter, including that of Sarsour's leadership role in an organization that has been found to have been involved in activities providing funds to Hamas.

*Id.* at 2–3. The May 15, 2025, letter referenced in Secretary Rubio's Memorandum is not in the record.

On February 10, 2026, Assistant Attorney General for Civil Rights Harmeet Dhillon announced the Justice Department's intention to "investigate," "prosecute" and "dismantle" organizations like AMP. Dkt. 21 at ¶ 67 (citing Marc Rod, *DOJ aims to 'dismantle' groups behind synagogue protests, Harmeet Dhillon Says*, Jewish Insider (Feb. 10, 2026), https://jewishinsider.com/ 2026/02/department-of-justice-synagogue-protests-harmeet-dhillon/).

Canary Mission had a profile on Mr. Sarsour, and it appears to have been updated on March 26, 2026, less than a week before his arrest. Dkt. 21 ¶¶ 64–65.

On March 30, 2026, Mr. Sarsour was surrounded by armed, plainclothes agents who came from at least 10 unmarked vehicles. *Id.* ¶¶ 69–71. Once an agent identified himself as an ICE agent and informed Mr. Sarsour that he was being arrested, Mr. Sarsour complied. *Id.* ¶ 72. The arrest was conducted pursuant to an I-200 administrative warrant. Dkt. 29-2 at 2. Eventually, Mr. Sarsour was transported to the Clay County, Indiana, Jail, where he remains detained. Dkt. 21 ¶ 76.

In connection with his arrest and detention, Mr. Sarsour was served with a Notice to Appear, charging him with removability on several bases under federal statutes:

(1) § 1227(a)(4)(C)(i), pursuant to Secretary Rubio's memorandum;

(2) § 1227(a)(4)(B), citing Mr. Sarsour's convictions by the Ramallah Military Court;[3]

(3) § 1227(a)(1)(A) and (a)(6)(C)(i) for making willful misrepresentations;[4] and

(4) § 1227(a)(3)(D) for representing himself as a United States citizen.

Dkt. 29-2 at 4, 7–9.

---

[3] This charge has since been divided into two separate charges, both brought under § 1227(a)(4)(B). Dkt. 29-2 at 20.

[4] The § 1227(a)(6)(C)(i) charge has since been withdrawn; the § 1227(a)(1)(A) remains pending. Dkt. 29-1 ¶¶ 14–15; dkt. 29-2 at 20.

As a result of these charges, Mr. Sarsour is currently in removal, or deportation, proceedings. *Id.* at 4.

Mr. Sarsour argues that the government's recent decision to arrest and detain him after 33 years in the United States was because of his advocacy for Palestinian rights and his association with AMP. Dkt. 21 ¶ 81. Mr. Sarsour states that his detention has prevented him from serving the Muslim community of Milwaukee and from advocating in support of Palestinian rights. Dkt. 32-2 ¶ 94.  Respondents do not counter that statement or provide contrary evidence.

## II.    Discussion

By way of background, Mr. Sarsour argues in his habeas petition that his detention violates the First and Fifth Amendments, the Administrative Procedures Act (APA), and the *Accardi* doctrine. He asks the Court to order his release and "[d]eclare that the Policy of targeting noncitizens for apprehension and detention based on perceived support for Palestinian rights—and specifically based on board membership in or association with American Muslims for Palestine—violates the First Amendment and the Administrative Procedure Act." Dkt. 21 at 20. Respondents counter that the Court lacks jurisdiction to hear Mr. Sarsour's claims and that his claims fail on the merits. Dkt. 29.

### A. Jurisdiction

Mr. Sarsour's claims "necessarily imply the invalidity of [his] confinement," and therefore "fall within the core of the writ of habeas corpus

and thus must be brought in habeas." *Trump v. J.G.G.*, 604 U.S. 670, 672 (2025). Respondents argue that under two provisions of the Immigration and Nationality Act (INA), the Court lacks jurisdiction over Mr. Sarsour's habeas petition. Dkt. 29 at 6–19.

### 1.    8 U.S.C. § 1252(b)(9)

Respondents argue that 8 U.S.C. § 1252(b)(9) prevents the Court from exercising jurisdiction over Mr. Sarsour's petition. *Id.* at 6–11. The umbrella provision of § 1252(b) begins: "With respect to review of an order of removal under subsection (a)(1), the following requirements apply: . . . ." 8 U.S.C. § 1252(b). As this text suggests, § 1252(b) sets out requirements only with respect to review of an order of removal. Since there is no order of removal for Mr. Sarsour, § 1252(b)(9) does not apply. Moreover, § 1252(b)(9) bars district court review of claims "arising from . . . action[s] taken or proceeding[s] brought to remove an alien[.]" 8 U.S.C. § 1252(b)(9). The Supreme Court has held that this section "does not present a jurisdictional bar where those bringing suit are not asking for review of an order of removal, the decision . . . to seek removal, or the process by which . . . removability will be determined." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 19 (2020) (citing *Jennings v. Rodriguez*, 583 U.S. 281 (2018) (plurality opinion)). Here, Mr. Sarsour is challenging the legality of his detention, not decisions or orders related to his removability.

Respondents cite *Khalil v. President*, 164 F.4th 259, 266 (3d Cir. 2026), in support of their argument that under § 1252(b)(9), the Court lacks

10

jurisdiction over Mr. Sarsour's habeas petition.  Dkt. 29 at 8. There, Mr. Khalil filed a petition for a writ of habeas corpus claiming that his detention was unlawful after Secretary Rubio invoked 8 U.S.C. § 1227(a)(4)(C), resulting in Mr. Khalil's arrest.  *Khalil*, 164 F.4th at 266. The Third Circuit found that § 1252(b)(9) "strip[ped] the District Court of jurisdiction, requiring Khalil to wait to raise his claims until he files a petition for review (PFR) of a final order of removal." *Id.* at 273. In support, the court cited *Jennings*, which "note[d]" that the jurisdictional question posed by § 1252(b)(9) may be more difficult if a petitioner challenges "the decision to detain him in the first place."  *Jennings*, 583 U.S. at 294; *Khalil*, 164 F.4th at 277.

But in *Regents*, which came after *Jennings*, the Supreme Court stated that "[§ 1252(b)(9)] is certainly not a bar where . . . the parties are not challenging any removal proceedings."  583 U.S. at 19.  Likewise, *Regents* favorably cited Justice Breyer's dissent in *Jennings*, which found that § 1252(b)(9) did not affect jurisdiction because "by its terms [§ 1252(b)(9)] applies only '[w]ith respect to review of an order of removal under [§ 1252(a)(1)]' § 1252(b)." *Jennings*, 583 U.S. at 355 (Breyer, J., dissenting); *Regents*, 591 U.S. at 19.

In sum, Mr. Sarsour does not challenge an order of removal—no such order has even been entered—so § 1252(b)(9) does not deprive the Court of jurisdiction over Mr. Sarsour's habeas petition.  In this case, Mr. Sarsour seeks release from detention, arguing that it is unlawful.  This is the very claim that has been at the remedial heart of the Great Writ throughout our constitutional

history.  *See Preiser v. Rodriguez*, 411 U.S. 475, 498 (1973) (describing "immediate release or a speedier release from . . . confinement" as "the heart of habeas corpus").

### 2.        8 U.S.C. § 1252(g)

Respondents also argue that 8 U.S.C. § 1252(g) deprives this Court of jurisdiction to adjudicate Mr. Sarsour's habeas petition. Dkt. 29 at 11–19. Subsection 1252(g) bars jurisdiction over claims "arising from the decision or action by the Attorney General to *commence* proceedings, *adjudicate* cases, or *execute* removal orders."  8 U.S.C. § 1252(g) (emphasis added); *Reno v. Am.-Arab Anti-Discrimination Comm. ("AADC")*, 525 U.S. 471, 482 (1999). Respondents argue that § 1252(g) applies here because Mr. Sarsour's habeas petition seeks to challenge the decision to commence proceedings, not just his detention.  In other words, Mr. Sarsour's challenge to his detention *is* a challenge to the Attorney General's decision to "commence proceedings."  8 U.S.C. § 1252(g); dkt. 29 at 11.

Supreme Court precedent makes clear, however, that this bar is only "narrow[ly]" applied to the *discrete* action.  *See AADC*, 525 U.S. at 482.  Here, Mr. Sarsour's habeas petition does not challenge the discrete action to commence proceedings; it challenges his detention.  *See, e.g.*, dkt. 21 at 15 ("The government's *detention* of Mr. Sarsour was due to his advocacy on behalf of Palestinian human rights and his association as a board member of AMP." (emphasis added)); *Ozturk v. Hyde*, 155 F.4th 187, 208 (2d Cir. 2025) (Nathan, J., concurring) ("[D]etention is but one of many . . . decisions or actions that

12

may be part of the deportation process, but it is outside the three discrete actions § 1252(g) cordons off.").

Respondents argue that Mr. Sarsour's challenge to his detention is "inextricably linked" to the "decision to commence . . . removal proceedings against him." Dkt. 29 at 16. But Supreme Court precedent and the text of § 1252(g) do not allow such a broad-sweeping interpretation. *See also Parra v. Perryman*, 172 F.3d 954, 957 (7th Cir. 1999) (concluding that § 1252(g) did not prevent court's consideration of petitioner's challenge to his detention without bond because he "did not ask the district court to block a decision 'to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.' His claim concerns detention while the administrative process lasts, and it may be resolved without affecting pending proceedings."); *see also Ozturk v. Hyde*, 136 F.4th 382, 397 (2d Cir. 2025) (finding that § 1252(g) did not preclude the habeas court's jurisdiction because "Öztürk's claims of unlawful and retaliatory detention are independent of, and collateral to, the removal process"); *Suri v. Trump*, 2025 WL 1806692, *8 (4th Cir. July 1, 2025) (unreported) (concluding that 1252(g) did not extend to habeas challenges to present immigration confinement, noting "[a]bsent habeas relief, an immigration detainee can generally seek judicial review of a final order of removal—but the court would be powerless to remedy any unconstitutional detention that had already occurred").[5]

---

[5] The government independently argues that 8 C.F.R. § 1003.19(h)(1)(ii) "serves as a nail in the coffin of jurisdiction." Dkt. 29 at 18. That regulation provides that aliens "described in section 237(a)(4) of the Act" may "seek a determination by an

For these reasons, § 1252(g) does not bar this Court from adjudicating Mr. Sarsour's challenge to the legality of his detention.

### B. Motion for Release

Mr. Sarsour has filed a motion for his release pending adjudication of his removal proceeding. Dkt. 32.

The Court has inherent authority to release immigration detainee habeas petitioners on bond.

> Inherent judicial authority to grant bail to persons who have asked for relief in an application for habeas corpus is a natural incident of habeas corpus, the vehicle by which a person questions the government's right to detain him. A judge ought to be able to decide whether the petitioner should be allowed to go free while his claim to freedom is being adjudicated.

*Bolante v. Keisler*, 506 F.3d 618, 620 (7th Cir. 2007). This authority, however, is not unlimited:

> [A]n inherent judicial authority is not an indefeasible authority. It is an exercise of a court's common law powers and thus, unlike a ruling based on the Constitution, is subject to legislative curtailment. Even if in the absence of legislation a federal court could grant bail . . . it cannot do so if Congress has forbidden it.

*Id.* In *Bolante*, the Seventh Circuit found that Congress, in 8 U.S.C. § 1252(a)(2)(B)(ii), had forbidden the federal court to grant bail where the Attorney General had made a discretionary decision to deny release. 506 F.3d at 621. Therefore, release on bail was unavailable.

---

immigration judge" that they are not properly included in that paragraph. 8 C.F.R. § 1003.19(h)(1)(ii). So, the government argues, the regulation points Mr. Sarsour to the agency, not the courts, for relief. Dkt. 29 at 18. But Mr. Sarsour challenges the legality of his detention, not whether he is ultimately subject to § 237(a)(4) (8 U.S.C. § 1227(a)(4)).

14

Here, while § 1252(a)(2)(B)(ii) does not apply, Respondents argue that Congress has similarly precluded federal courts from granting release under 8 U.S.C. § 1252(b)(9) and (g). Dkt. 35 at 13–25. In support, the Respondents restate their arguments that these statutory provisions render Mr. Sarsour's claims only reviewable through the petition for review process.[6] *Id.* Those arguments fail here for the same reasons previously stated in this Order.

Mr. Sarsour offers two procedural paths for the Court to evaluate his motion for release: applying the standard established in *Mapp v. Reno*, 241 F.3d 221, 230 (2d. Cir. 2001),[7] or the standard for preliminary injunctions under Rule 65 of the Federal Rules of Civil Procedure.  Respondents do not propose an alternative standard, so the Court applies *Mapp*.  *See Petrunak v. United States,* No. 117CV04396WTLMJD, 2017 WL 11469612 (S.D. Ind. Dec. 21, 2017) (applying *Mapp*), *aff'd*, No. 18-1173, 2018 WL 11601299 (7th Cir. Jan. 26, 2018); *Suri v. Trump*, No. 1:25-CV-480 (PTG/WBP), 2025 WL 1392143 (E.D. Va. May 14, 2025) (granting motion for release briefed under *Mapp* standard).

---

[6] Respondents extend their arguments to state that Mr. Sarsour's detention is based on more than just his § 1227(a)(4)(C) charge. Dkt. 35 at 24–25. This does not alter the Court's decision that it has jurisdiction to hear Mr. Sarsour's challenges to his detention. Whether there is a lawful basis for Mr. Sarsour's detention is a question on the merits and not on jurisdiction.

[7] The Respondents assert that the Seventh Circuit "expressly rejected *Mapp*" in *Bolante*. Dkt. 35 at 13. The *Bolante* court, however, did not reject *Mapp*; it rejected *Elkimya v. Department of Homeland Security,* 484 F.3d 151 (2d Cir. 2007). *Bolante*, 506 F.3d at 620. Further, as Respondents note, *Bolante* applies where courts are "jurisdictionally barred from releasing or reviewing the petitioner's habeas challenge by the INA," dkt. 35 at 26, which the Court has determined is not the case here.

### 1. Legal Standard

Under *Mapp*, "a court considering a habeas petitioner's fitness for bail must inquire into whether 'the habeas petition raise[s] substantial claims and [whether] extraordinary circumstances exist[ ] that make the grant of bail necessary to make the habeas remedy effective.'" *Mapp*, 241 F.3d at 230. The petitioner bears the burden of proof. *Id.* at 226.

### 2. Substantial Claim: First Amendment Retaliation

"Congress shall make no law . . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble[.]" U.S. Const. amend. I. "The First Amendment reflects 'a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.'" *Snyder v. Phelps*, 562 U.S. 443, 452 (2011). To make out a *prima facie* First Amendment retaliation claim, a petitioner must show that "(1) he engaged in activity protected by the First Amendment; (2) he suffered a deprivation that would likely deter First Amendment activity in the future; and (3) the First Amendment activity was 'at least a motivating factor' in the Defendants' decision." *Bridges v. Gilbert*, 557 F.3d 541, 546 (7th Cir. 2009). If the petitioner makes that showing, the burden shifts to the respondent to present evidence that they would have taken the relevant action even in the absence of protected speech. *See Minocqua Brewing Co. LLC v. Hess*, 160 F.4th 849, 855 (7th Cir. 2025). And if they do so, the burden shifts back to the petitioner to show that the proffered reason is "pretextual and that retaliatory animus was the actual motivation." *Id.*

16

Here, Mr. Sarsour argues that he was arrested and detained in retaliation for his speech in support of Palestinian rights, making his detention unlawful. Dkt. 33 at 12–17. Respondents argue that Mr. Sarsour does not present a substantial claim of First Amendment retaliation because (1) he does not have the same First Amendment rights as citizens do, (2) foreign policy and national security considerations allow restriction of Mr. Sarsour's First Amendment rights, (3) there is insufficient evidence suggesting unlawful targeting and bias to displace "the presumption in favor of regularity," and (4) Mr. Sarsour is challenging only his § 1227(a)(4)(C) charge.[8] Dkt. 35 at 12, 29–33. As to the last argument, Respondents' interpretation of Mr. Sarsour's claims is too narrow. Mr. Sarsour argues that "his detention is a part of the recognized policy of targeting non-citizens for protected speech." Dkt. 37 at 3, 7 ("Mr. Sarsour is disputing each and every ground of removal in the immigration court proceedings. In *this* proceeding, Mr. Sarsour is requesting his release from unlawful detention."). Thus, the Court considers whether Mr. Sarsour has presented a substantial claim that his detention violates his rights under the First Amendment.

---

[8] The government's position on whether Mr. Sarsour is detained under 8 U.S.C. § 1226(a) or § 1226(c) is difficult to follow. *See* dkt. 29 at 19 ("[Mr.] Sarsour's detention is constitutional and statutorily mandated pursuant to 8 U.S.C. § 1226(c)."). *But see* dkt. 35 at 11 n.2 ("Whether Sarsour's detention authority could also fall under § 1226(c) is a complex question that need not be resolved today. For the limited purpose of this document, Respondents assume § 1226(a) governs Sarsour's detention as opposed to § 1226(c)."). Respondents do not explain this equivocation. Still, because Respondents assert for purposes of this motion that detention is governed by § 1226(a) and Mr. Sarsour does not object, the Court assumes for the purpose of deciding the motion for release that Mr. Sarsour's detention is governed by § 1226(a).

17

### a.  Protected Speech

"[S]peech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick v. Myers*, 461 U.S. 138, 145 (1983). Although Mr. Sarsour is not a U.S. citizen, "once an alien lawfully enters and resides in this country he becomes invested with the rights guaranteed by the Constitution to all people within our borders. Such rights include those protected by the First and the Fifth Amendments and by the due process clause of the Fourteenth Amendment." *Kwong Hai Chew v. Colding*, 344 U.S. 590, 598 n.5 (1953); *see also Bridges v. Wixon*, 326 U.S. 135, 148 (1945) ("Freedom of speech and of press is accorded aliens residing in this country."). Mr. Sarsour has been a conditional lawful permanent resident since 1993 and a full lawful permanent resident since 1998. Dkt. 21 at ¶ 21 (amended petition). His speech related to Palestinian rights is core political speech and squarely within the scope of the First Amendment. *See Virginia v. Black*, 538 U.S. 343, 365 (2003) ("[P]olitical speech [is] at the core of what the First Amendment is designed to protect.").

Respondents, however, argue that Mr. Sarsour's First Amendment rights must yield to foreign relations and national security.

> [Supreme Court] precedents, old and new, make clear that concerns of national security and foreign relations do not warrant abdication of the judicial role. We do not defer to the Government's reading of the First Amendment, even when such interests are at stake. . . . [T]he Government's authority and expertise in these matters do not automatically trump the Court's own obligation to secure the protection that the Constitution grants to individuals.

*Holder v. Humanitarian L. Project*, 561 U.S. 1, 34 (2010). While "respect for the Government's conclusions is appropriate" when "collecting evidence and drawing factual inferences" on matters of national security and foreign relations, the mere invocation of foreign relations concerns does not automatically trump First Amendment rights. *Id.*

Relatedly, Respondents argue that "it should be clear and obvious that gratuitously hosting those who were convicted of throwing Molotov cocktails at perceived Israeli collaborates and providing safe harbor to those who attack allied soldiers would have negative foreign policy implications." Dkt. 35 at 31. But Mr. Sarsour has produced evidence that the government has known about his military court charges for 25 years and considered them on multiple occasions yet did not arrest and detain him until 2026. Dkt. 21 ¶ 36 (amended petition); dkt. 32-2 ¶ 4 (verifying under penalty of perjury that the amended petition is accurate). Indeed, on the contrary, the United States approved Mr. Sarsour's citizenship application despite these convictions. Dkt. 29-2 at 13.

The cases cited by Respondents are factually different, involve different issues, and are not controlling here. Dkt. 35 at 22 (citing Supreme Court cases). Respondents further argue that if "presence" can be a basis for a § 1227(a)(4)(C) charge of removability, then surely speech can as well. Dkt. 35 at 31. But the Court is not deciding the constitutionality of § 1227(a)(4)(C)(i); it is determining whether Mr. Sarsour has made a substantial claim that his detention is retaliation for his protected speech and therefore unlawful.

In sum, Mr. Sarsour's speech in support of Palestinian rights is protected by the First Amendment.

### b. Deprivation Likely to Deter First Amendment Activity

Mr. Sarsour has experienced a deprivation likely to deter First Amendment activity—ICE officers detained him, and he continues to be held in custody. Dkt. 21 ¶¶ 71–76; *see Douglas v. Reeves*, 964 F.3d 643, 646 (7th Cir. 2020) ("We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity."); *see also Howe v. Hughes*, 74 F.4th 849, 852 (7th Cir. 2023) ("[C]ivil confinement constitutes a significant deprivation of liberty."); *Hawkins v. Mitchell*, 756 F.3d 983, 997 (7th Cir. 2014) ("[A]rrest qualifies as a deprivation that is likely to deter First Amendment Activity.").

### c. Retaliatory Motive

Last, and most complicated, is whether Mr. Sarsour has presented a substantial claim that his detention is based on a retaliatory motive for engaging in protected speech.  *See Bridges*, 557 F.3d at 546; *Hess*, 160 F.4th at 855.

Mr. Sarsour has submitted evidence allowing a reasonable inference that his protected speech was "at least a motivating factor" in Respondents' decision to detain him, *see Bridges*, 557 F.3d at 546:

- The United States government knew about Mr. Sarsour's Israeli military court convictions for decades but still permitted him to be approved for naturalization and live in the United States since that time. Dkts. 33 at 8–9, 27 (citing Sarsour Decl. ¶ 59); 21 at ¶¶ 21, 36.

- Mr. Sarsour has spoken openly about his support for Palestinian human rights.  Dkt. 32-2 ¶ 103 (Sarsour Decl.); dkt. 21 ¶¶ 37–38.

- Executive Order 14161, 90 Fed. Reg. 8451, issued January 20, 2025, states "the United States must ensure that admitted aliens . . . do not bear hostile attitudes toward [the United States's] citizens, culture, government, institutions, or founding principles." Dkt. 33 at 15; Exec. Order No. 14161, 90 Fed. Reg. 8451 (Jan. 20, 2025). "Hostile attitudes" is not defined. *Id.*

- Assistant Attorney General for Civil Rights Harmeet Dhillion issued a statement on February 10, 2026, that the Justice Department would "investigate," "prosecute", and "dismantle" organizations like AMP.[9] Dkt. 33 at 13.

- Canary Mission updated Mr. Sarsour's profile on March 26, 2026, just days before his arrest. Dkts. 33 at 13; 21 at ¶ 65.[10]

- Mr. Sarsour's arrest by ICE on March 30, 2026.  Dkts. 33 at 13; 21 at ¶ 69.

In response, Respondents argue that there is generally a "presumption in favor of regularity" and that it would be "remarkable, and surely unjustified on this record to countenance a claim that the Secretary of State was motivated by bias and unlawful targeting."  Dkt. 35 at 30 (citing *Nardea v. Sessions*, 876 F.3d 675, 680 (4th Cir. 2017)).  "The presumption of regularity supports the official acts of public officers, and in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties."  *United States v. Chem. Found.*, 272 U.S. 1, 14 (1926).

---

[9] Marc Rod, *DOJ aims to 'dismantle' groups behind synagogue protests, Harmeet Dhillon Says*, Jewish Insider (Feb. 10, 2026) https://jewishinsider.com/2026/02/department-of-justice-synagogue-protests-harmeet-dhillon/.

[10] There is no allegation or evidence that Respondents were responsible for or involved with maintaining or updating the Canary Mission website.  It is included here based on evidence that 75% of the student protesters investigated by Homeland Security Investigations for immigration-related arrest and detention came from Canary Mission. Dkt. 21 ¶¶ 62–63.

But Respondents do not explain why the evidence designated by Mr. Sarsour and summarized above is insufficient to rebut the presumption. Even more, they do not argue that the evidence doesn't support an inference of retaliatory motive, nor do they cite evidence to overcome the inference. Dkt. 35 at 29–33. Instead, they argue that the government "should not have to disclose its 'real reasons' for deeming nationals of a particular country a special threat." *Id.* at 30 (citing *American-Arab Anti-Discrimination Comm.*, 525 U.S. at 491). Respondents may be able to rely on that principle to limit the scope of information that the government must disclose. For now, however, it's sufficient for the Court to find that by providing no evidence in response to Mr. Sarsour's motion, Respondents have not shown that they would have detained Mr. Sarsour even in the absence of his protected speech. *See Minocqua Brewing Co.*, 160 F.4th at 855.

*       *       *

In sum, the sole issue presently before the Court is Mr. Sarsour's motion for release pending adjudication of his habeas petition. The Court has determined that it has jurisdiction over Mr. Sarsour's habeas petition, and by extension, his motion for release, and that Mr. Sarsour has presented a substantial claim of First Amendment retaliation. The Court does not decide the ultimate outcome of Mr. Sarsour's First Amendment claim or the merits of the charges of removability against him—the latter is the role of the immigration court. The Court only concludes, on the present record, that Mr.

22

Sarsour has raised a "substantial" First Amendment retaliation claim, which could render his *detention* unlawful.[11] *Mapp*, 241 F.3d at 230.

### 3. Extraordinary Circumstances

Under *Mapp*, the Court must next consider whether this case presents "extraordinary circumstances." *Mapp*, 241 F.3d at 226.

Mr. Sarsour is the president of the largest mosque in Wisconsin and is a board member of AMP, which educates the American public on issues related to Palestine. Dkt. 21 ¶ 24–25 (amended petition). He also speaks openly in favor of Palestinian human rights. *Id.* ¶ 37. Mr. Sarsour is therefore a well-known figure on the topic of Palestinian human rights. And because of his detention, Mr. Sarsour can no longer speak freely on these matters of public concern or continue his work with AMP to educate the American public about Palestine. Dkt. 32-2 ¶¶ 102–03.

"The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (per curiam) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Additionally, in First Amendment cases, "quantification of injury is difficult and damages are therefore not an

---

[11] As noted by Mr. Sarsour, four other individuals who were detained under § 1227(a)(4)(C), and had engaged in speech supporting Palestine or criticizing Israel, were released on bail after courts concluded they had shown a substantial likelihood of constitutional violations. Dkt. 33 at 17 (citing *Mahdawi v. Trump*, 781 F. Supp. 3d 214 (D. Vt. 2025); *Ozturk v. Trump*, 783 F. Supp. 3d 801, 811 (D. Vt. 2025); *Suri v. Trump*, No. 1:25-CV-480 (PTG/WBP), 2025 WL 1392143, at *1(E.D. Va. May 14, 2025) (Giles, J.); *Khalil v. Joyce*, 25-cv-01963, Dkt. No. 316 (D. N.J. June 20, 2025)).

adequate remedy." *ACLU of Illinois v. Alvarez*, 679 F.3d 583, 589 (7th Cir. 2012); *see also Nat'l People's Action v. Vill. of Wilmette*, 914 F.2d 1008 (7th Cir. 1990) ("[I]njunctions are especially appropriate in the context of first amendment violations because of the inadequacy of money damages").

Mr. Sarsour's history and immigration status in the United States further demonstrates the extraordinary nature of this case. And relatedly, the infrequency with which the foreign policy deportability ground has been invoked since its introduction in 1990 (only four prior instances before March 2025, none of which concerned domestic speech) further contributes to the extraordinary circumstances. *See AAUP*, 802 F. Supp. 3d at 143 n.20.[12]

The Court also considers Mr. Sarsour's health issues as a factor making the circumstances here extraordinary. His counsel advised the Court at a status conference on June 8, 2026, that he has lost over 30 pounds while incarcerated and that he is at constant risk of developing serious complications from diabetes given that the medical staff only checks his blood-sugar levels once a month. *See Ozturk v. Hyde*, 783 F. Supp. 3d 801, 812 (D. Vt. 2025) (finding petitioner's "declining health in custody provides another basis for finding extraordinary circumstances").

The Court also "consider[s] the conventional bail issues of risk of flight and danger to society," which also support a finding of extraordinary

---

[12] The government identified the four cases in *Khalil* at the district court's request. *AAUP*, 802 F. Supp. 3d at 143 n.20. While amicus curiae identified 14 cases in which the government invoked this clause, they noted that this was out of 11.7 million cases. Dkt. 39 at 7 (citing Decl. of Graeme Blair, Ph.D, dkt. 39-1 at ¶¶ 6, 8 12; dkt. 39-1, App. I).

circumstances justifying bail. *See Mahdawi v. Trump*, 781 F. Supp. 3d 214, 232 (D. Vt. 2025) (considering these factors as part of the *Mapp* analysis).

Mr. Sarsour has marshaled substantial evidence showing that he is not a flight risk. Dkt. 32-2 ¶ 74. He has a long history of compliance with the immigration system. *Id.* ¶ 73. He is a lawful permanent resident of the United States and is "deeply dedicated to [his] family and community" of Milwaukee, "the only home [he has] known in the thirty-three years [he has] lived in the United States. *Id.* ¶¶ 7, 74, 100. His spouse, six children, and nine grandchildren are all United States citizens. *Id.* ¶¶ 67–69. Over 200 people have signed declarations in support of Mr. Sarsour's request for release, many of which explicitly state that he is neither a flight risk nor a danger to the community. *See generally* dkt. 32-1; *see also, e.g.*, dkt. 32-1 at 169 (Decl. of Dr. Mohammad Fareed, attesting to Mr. Sarsour's "sustained commitment to the Milwaukee community" and "stat[ing] without hesitation that he poses no danger to the community and does not present a risk of flight"), 227-28 (Decl. of Dr. Hashim Zaibak, attesting to Mr. Sarsour's strong connection to the Milwaukee community, particularly the role he plays in caring for his elderly mother, and opining that he is neither a flight risk nor danger, but rather, "a pillar of this community, someone whose absence is felt profoundly by the many people who rely on him"), 315 (Decl. of Malek Odetallah, attesting to Mr. Sarsour being "a respected member of the community, a business owner, and someone who is deeply rooted in the local area" and therefore someone who "poses no risk of flight and no danger to the community"), 397–98 (Decl. of

25

Imam Noman Hussain) (attesting to Mr. Sarsour's family ties and "deep commitment to Milwaukee" and noting "[h]e has no reason to flee, and every reason to stay"), 505 (Decl. of Sheila Badwan) ("His deep roots in this community and his ongoing contributions make it clear that he is not a flight risk and poses no danger to the public."). The Respondents have submitted no evidence showing that Mr. Sarsour is a flight risk.

As to danger, Respondents strongly emphasize Mr. Sarsour's convictions by the Ramallah Military Court. Dkt. 35 at 28. They do not address, however, the fact that these convictions are from over 30 years ago. Neither do they acknowledge that the United States government has known about those charges for decades yet took no action to detain Mr. Sarsour. Dkt. 21 ¶¶ 21, 36. On the contrary, he was approved for lawful permanent residence and U.S. citizenship. *Id.* ¶ 21; 29-2 at 13. Respondents do not explain how these distant events suddenly now show that Mr. Sarsour is a danger. Also, Mr. Sarsour has no criminal history from his decades living in this country. Dkt. 32-2 ¶ 64.

Given Mr. Sarsour's decades of living a law abiding life in the United States and the long passage of time between his prior convictions, the Court finds Mr. Sarsour does not present a danger should he be released.[13] *Cf. United*

---

[13] Respondents also claim that the Court should not "substitute this Court's judgment for that of the Executive to whom Congress has entrusted with the detention determination § 1226(a) and made unreviewable by § 1226(e)." Dkt. 35 at 38. Section 1226(e) states that "[t]he Attorney General's discretionary judgment regarding the application of this section shall not be subject to review." But "[t]he Attorney General lacks discretion to violate the first amendment." *See Skutnik v. I.N.S.*, 128 F.3d 512, 514 (7th Cir. 1997).

*States v. Fletcher*, 15 F.3d 553, 557 (6th Cir. 1994) ("[A] district court may take the age of prior convictions into account when considering a defendant's likelihood of . . . recidivism.").

### 4. Necessary to Make Habeas Remedy Effective

Under *Mapp*, the Court must also determine whether bail is "necessary to the effectiveness of . . . the habeas relief petitioner s[eeks]." *Mapp*, 241 F.3d at 231–32. Mr. Sarsour's detention prevents him from engaging in advocacy for Palestinian human rights. *See, e.g.*, dkt. 33 at 12–17. Thus, if this Court concludes that Mr. Sarsour's First Amendment rights have been violated, his "detention will have been an unconstitutional deprivation with no public purpose or benefit," *Ozturk*, 783 F. Supp. 3d at 813, entitling him to habeas relief.[14]  Furthermore, as Mr. Sarsour argues, this case presents complex legal issues, and appeals related to those issues "may lead to substantial delay in the adjudication of the underlying habeas petition[.]" Dkt. 33 at 1, n.1; *see Cuomo*, 592 U.S. at 19.  These factors suggest that release on bail is necessary to make the habeas remedy effective.

Because the Court finds that Mr. Sarsour has satisfied the requirements for release under the *Mapp* standard on his First Amendment claim, the Court does not evaluate his other claims at this juncture.

---

[14] Though the Court is not aware of a Seventh Circuit case specifically allowing habeas relief based on First Amendment retaliation claims, the core of the habeas remedy permits relief when a petitioner demonstrates unconstitutional confinement.  *See Preiser*, 411 U.S. at 498.  Mr. Sarsour has raised a substantial claim to this effect.  *See supra* Subsection II.B.2; *see also Mahdawi*, 781 F. Supp. 3d at 234 ("The Second Circuit has specifically recognized that retaliation for protected political speech is a cognizable ground for habeas relief in the immigration context.").

### D. Conditions of Release

Respondents propose conditions of release, including a $25,000 bond, an ankle monitor, check-ins with ICE, home confinement, and a requirement that he report back to custody if ordered to do so. Dkt. 35 at 38. They state that this is necessary to ensure compliance with a removal order and because ICE's ability to ensure Mr. Sarsour's presence at removal proceedings is harmed by his release. *Id.*

Such conditions are not necessary here. Mr. Sarsour has no history of non-compliance and is well established in the Milwaukee community. Dkt. 32-2 ¶¶ 7, 73–74, 100. Mr. Sarsour's entire family lives in the United States and he has not traveled outside the United States since 1998. *Id.* ¶¶ 23, 27. Also, Mr. Sarsour has provided voluminous evidence demonstrating that he is not a risk of flight. *See supra* Subsection II.B.3. Respondents argue generally that monetary bond, an ankle monitor, and home confinement are "necessary to mitigate the harms done to ICE's ability to ensure his presence at removal proceedings and to ensure compliance with a removal order." Dkt. 35 at 38. But Respondents designate no evidence in support of this argument. *Id.*

Accordingly, he will be released on his personal recognizance with the following additional conditions: (1) Mr. Sarsour will reside in Wisconsin; (2) he will attend all court hearings in this case in person unless excused by order of the Court; and (3) he will participate in his removal proceedings.

### III.   Conclusion

The unopposed motion to file an amicus brief, which provides a unique perspective and may be useful to the Court in resolving the petition, is **granted**. Dkt. [38]. *Voices for Choices v. Illinois Bell Tel. Co.,* 339 F.3d 542, 544 (7th Cir. 2003) (Posner, J., in chambers).

The motion for release pending the adjudication of the habeas petition, dkt. [32], is **granted**.  Respondents shall immediately release Mr. Sarsour on his personal recognizance, subject to the above-stated conditions.

**SO ORDERED.**

Date: 6/18/2026

*James Patrick Hanlon*

James Patrick Hanlon
United States District Judge
Southern District of Indiana

Distribution:

All electronically registered counsel